STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERTA SEEFELDT, DEFENDANT-APPELLANT.

Argued March 18, 1968—Decided May 6, 1968.

Mr. *Peter Murray,* Public Defender, argued the cause for defendant-appellant (Mr. *Richard Newman,* Deputy Public Defender, of counsel; *Miriam N. Span,* Assistant Deputy Public Defender, on the brief).

Mr. *Richard A. Grossman,* Assistant Prosecutor, argued the cause for plaintiff-respondent (Mr. *Robert H. Doherty, Jr.,* Ocean County Prosecutor; Mr. *Richard A. Grossman,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

PROCTOR, J. After a trial in the Ocean County Court, Roberta Seefeldt was convicted of murder in the first degree for the killing of her husband and, pursuant to the jury's recommendation, was sentenced to life imprisonment. She appealed directly to this Court under former *R. R.* 1:2–1(c) (Amended October 5, 1967).

The victim, Gerald Seefeldt, was a sergeant in the Marine Corps. On November 15, 1966, while stationed in Tennessee, he married the defendant whom he had met in that state. About a week after the marriage, the Sergeant was assigned to the Lakehurst Naval Air Station in New Jersey. He and his wife moved to an apartment in Seaside Park, a few miles from the Naval Air Station.

Five weeks after his marriage, early in the morning of December 21, 1966, the body of Sergeant Seefeldt was found on the shoulder of a road near the main gate to the Station. Death was caused by six .22 caliber bullet wounds, five in the chest and one in the top of the skull.

A few hours after the body was found, Sergeant Seefeldt's locked Cougar automobile was seen parked in front of the Seefeldt apartment. Bloodstains in the car indicated that the shooting had taken place in the vehicle. There were only two sets of keys to the automobile; one set was found in Sergeant Seefeldt's pocket, the other set was in the possession of the defendant. At the trial the State put into evidence the defendant's carcoat upon which there were bloodstains identified as the same blood type found in the automobile. The bloodstains on the coat and in the automobile matched the blood type of Sergeant Seefeldt. Defendant's presence in the automobile during the early morning hours preceding the discovery of the body was established by two witnesses. An attendant at a gasoline station near the Air Station testified that between 12:30 and 2:00 A.M. on December 21 he sold gasoline to the defendant who was accompanied by a man. The guard at the gate of the Naval Air Station testified that at 1:30 A.M. the defendant, driv-

ing the Cougar, passed the guard post. A friend of the defendant testified that the defendant had told her that she kept a gun "down by the seat of the car." There also was evidence that in Tennessee shortly before her marriage the defendant owned several guns, including a .22 caliber revolver, and that after coming to New Jersey she told another friend that she had a gun and was a "crack shot." The murder weapon was never recovered.

There was evidence that on two occasions — one in the early part of December and the other on the day before the killing — the defendant told acquaintances that if her husband ever laid a hand on her she would "shoot him full of holes." A number of witnesses testified that she had complained about her marriage and expressed a strong dislike of her husband. Two men testified that they met the defendant in a tavern near the Air Station and during the month of December had sexual relations with her. One of these men stated that he was intimate with the defendant on the night before her husband's death and that two nights after the killing the defendant called him to her apartment where they again had sexual intercourse. A third man, Harry Jones, testified that in Tennessee during the summer of 1966, while he was in military service, he met the defendant. Their relationship became close and they discussed marriage. Early in November, however, shortly before defendant's marriage to Sergeant Seefeldt, Jones told her that he had decided not to marry her. Thereafter, he did not see the defendant until December 1 when she visited Tennessee and came to see him. At that time she told Jones that she had married "to spite" him. After her return to New Jersey, the defendant wrote to Jones in Tennessee asking to see him when he came to New Jersey on Christmas leave. On Christmas weekend, four days after the death of her husband, the defendant drove the Cougar to the home of Jones's parents in New Jersey. During the weekend visit she and Jones had sexual relations and she gave him several Christmas gifts, including a ring. Prior to this visit to Jones,

the defendant had made arrangements with the authorities at the Naval Air Station to fly to Nebraska where her husband was to be buried, but she did not appear at the funeral. After leaving Jones she went to Tennessee, abandoning the Cougar at the Philadelphia Airport.

Upon learning that the defendant did not attend Sergeant Seefeldt's funeral in Nebraska, the Ocean County Prosecutor's office obtained a warrant for her apprehension as a material witness. (At this time the police had a suspect in custody.) The police located her in Chattanooga, Tennessee, where she had been arrested on charges pending against her in Tennessee and unrelated to the present case. On December 31, in the company of two detectives of the Ocean County Prosecutor's office, she returned by plane to New Jersey. That night she was formally charged with the murder of her husband before a judge of the Ocean County Court.

At the trial three tape-recorded statements of the defendant were introduced into evidence over defense objections. The first statement (dated December 21, 1966) was taken by Detective Gallant when he interviewed the defendant at her apartment about six hours after her husband's body had been found. In this statement the defendant said that, at about midnight the night before, her husband had gone out for a drink with a friend. A few hours later the defendant saw him park the Cougar in front of the apartment and enter a white Volkswagen which immediately was driven away. She stated that she had never seen the Volkswagen before and did not recognize its driver. According to the defendant, she then slept until awakened by two officers from the Naval Air Station who told her of her husband's death.

The following day, at the request of Lieutenant McCulloch, the defendant came to the Ocean County Prosecutor's office and the second tape-recorded statement was taken (statement of December 22, 1966). This statement materially departed from the facts related in the December 21

statement. In the new statement she said that her husband told her that he had been in bed with the wife of "Fred Harding" at the Seefeldt apartment several nights before. The defendant identified the white Volkswagen mentioned in her prior statement as belonging to Fred. At about 2:30 A.M. on December 21, her husband telephoned and asked her to pick him up at a telephone booth in Lakehurst. When she arrived there, she said, Sergeant Seefeldt was in the Volkswagen with Fred and his wife. The Sergeant argued with her, and he and Fred got into the Seefeldt automobile. Fred's wife then drove the defendant home in the Volkswagen. About an hour later, Fred telephoned the defendant at her apartment and at about 5:00 A.M. came to the apartment. According to the defendant, he told her that she would never see her husband again and that if she said anything to anyone she "would be just like he [her husband] was." In the December 22 statement the defendant also stated that she had relations with the two men, other than Jones, who testified at the trial concerning their intimacy with her.

After the defendant gave this second statement, two police officers were assigned to protect her and on the following day, December 23, a suspect was taken into custody as the "Fred Harding" referred to in the defendant's statement. On that day the defendant picked the suspect out of a police line-up as the "Fred Harding" who had killed her husband. The suspect was charged with the murder.

The third tape-recorded statement was obtained on December 31, 1966 at the Ocean County Prosecutor's office after the defendant returned from Chattanooga. In this statement the defendant admitted shooting her husband and recanted her accusation of the suspect whom she previously had identified as "Fred Harding." Lieutenant McCulloch testified that during the questioning prior to the taping of the statement, the defendant told him she had falsely identified the suspect because he "was as good as any." In the taped statement, she said that she and her husband were drinking

at their apartment on the night of December 20 and at about midnight went for a drive in their car. With the defendant operating the Cougar, they stopped for gasoline (the record makes it clear that this is the stop to which the gasoline station attendant testified at trial). The defendant said that during the ride she and her husband were arguing over her involvement with other men. She drove down a dirt road and pointed out to her husband a spot where she had engaged in sexual intercourse with one of these men. According to the defendant, when she stopped the car her husband became angry, took a gun out of the glove compartment, removed it from its holster, and threatened to kill her. Her statement continues: "Then I grabbed the gun. He came on me and put his hand around my throat. I pushed Jerry up with my left hand and I got the gun up straight. I put both my hands on the gun. Jerry was trying to choke me, and I shot the gun four times. He slid down. He was still holding me by the neck, and I shot him again and he slid further and I shot him again." The defendant said that she then attempted to take her husband to the hospital at the Naval Air Station but as she was driving he fell against the gear shift lever, stalling the car. While the car was stopped, her husband fell out the door. The defendant said she was frightened by the approach of another vehicle and therefore pushed her husband's foot out of the car and drove away. She stated that on her way home she threw the gun into Barnegat Bay and after arriving at her apartment attempted to remove the bloodstains from the car. She hid the holster in the laundry room of the apartment house where it was later found by the police. In this statement she also said that the ring which she gave to Harry Jones as a Christmas gift had belonged to her husband.

The defendant's testimony at the trial was limited to the issue of the admissibility of the statement of December 31.[1]

---

[1] The trial judge refused to admit any statements made by the defendant after her arraignment on the night of December 31. This ruling was based on her testimony that she attempted to consult an attorney after the arraignment.

The sole defense witness was a physician who testified that he examined the defendant early in January 1967. He found a lump on the back of her head which he said the defendant told him resulted from being struck with the butt of a pistol on the night of Sergeant Seefeldt's death. Defense counsel contended before the jury that the defendant killed her husband in self-defense.

It was the State's theory that the defendant wished to be rid of her husband and was the aggressor in the shooting. The State contended that her gun was used in the killing, and that she had drawn it from alongside her seat in the car rather than that her husband had taken it from the glove compartment. In summation the prosecutor argued that it was inconceivable that the defendant could have wrested the gun from her husband, a Marine veteran who had seen action in Vietnam. The State emphasized that several witnesses had testified that there were no visible marks or bruises on the defendant on the day after the alleged struggle with her husband.

The defendant urges several grounds for reversal which we will consider in the order set forth in her brief.

Defendant challenges the admissibility of her tape-recorded statements of December 22 and December 31 under the exclusionary rule of *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966).[2] Each of the two tape recordings commences with a proper recital of the warnings required by *Miranda* and both tapes record the defendant's affirmative responses that she understood the rights described in each warning and that she was willing to waive these rights and answer questions.

The defendant's attack on the statement of December 22 is ill-founded. She contends that the tape-recorded statement is inadmissible, despite the presence on it of the *Miranda* routine, because the record is silent on the

---

[2] No objection on *Miranda* grounds is made here to the admissibility of defendant's tape-recorded statement made at her apartment on December 21.

question whether the warnings were given prior to the hour of questioning which admittedly preceded the taping of the statement used at the trial. The *Miranda* warning rules apply only when a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.,* at *p.* 444, 86 *S. Ct.,* at *p.* 1612, 16 *L. Ed. 2d,* at *p.* 706. Here, because the defendant was not in custody when questioned, the *Miranda* warnings — even those given on the tape recording itself — were not necessary. When she gave the statement of December 22 the defendant was at the prosecutor's office not as a suspect but rather in the role of a grieving widow attempting to aid in the solution of her husband's murder. The interview took place not in an interrogation room at a police station, but in the law library of the prosecutor's office. She was free to leave at any time and, in fact, at the conclusion of her statement returned to her apartment in Seaside Park. Certainly the request by the police that she keep herself available to aid in the investigation was but a routine and reasonable police practice, compliance with which was in no way mandatory. Indeed, on the day after the statement was given, the defendant made arrangements with the Naval authorities to accompany her husband's body to Nebraska for the funeral. Moreover, it is apparent that at the time the statement was given the defendant wished to impress the police with her cooperation in tracking down her husband's killer. To this end she gave the statement falsely accusing "Fred Harding" as the culprit. Later she selected an innocent man from a line-up as the guilty "Fred Harding." This effort to divert suspicion from herself would have been impossible had she refused to talk with the police. The reasoning of the Court of Appeals for the District of Columbia in the factually similar case of *Hicks v. United States,* 382 *F. 2d* 158 (1967) is particularly apposite. There the defendant reported to the police the death of the man with whom she was living; at the scene she told the police that the victim had arrived at their apartment bleeding from stab wounds he said were

inflicted by "some 'jitterbugs' who had jumped, robbed, and stabbed him." The defendant was taken to police headquarters to put this story into written form. Two hours after arriving at the station, and after having given the formal statement, the defendant confessed that she had stabbed the decedent. The District of Columbia Court held that *Miranda* did not preclude the use of the confession:

"Nor was there any 'custodial interrogation' in the *Miranda* sense. Questioning of a witness cannot be characterized as 'custodial interrogation' simply because it occurs at a police establishment. Nor is there anything in the record to indicate that Appellant had been deprived of her freedom of action in any significant way; since she never attempted to leave the presence of the police, it cannot be said that her presence at Headquarters was against her will, especially as it is now clear that her conduct and very presence at the police station were part of her attempt to put the police on a wild goose chase in search of the mythical 'jitterbug' attackers." *Id.* at 162.

So, too, in the present case the defendant was not at the prosecutor's office on December 22 as a suspect in custody upon whom the investigation had focused, but was there in an attempt to put the police on the trail of an innocent man as a scapegoat for the crime.

With reference to her statement of December 31, the defendant maintains "at the commencement of her interrogation, no one informed her of any rights . . . The State nowhere alleges in the record that defendant was so informed." This contention flies in the face of the testimony given at the trial by Lieutenant McCulloch:

"Q  Prior to doing that [questioning the defendant on December 31] did you tell her or give her any warnings in regards to her rights?

A  Prior to any conversation concerning this case, she was advised.

Q  Will you tell me, if you recall, what you advised her at that time?

A  First of all I advised her of her rights to remain silent. Second of all, I advised of her right to have an attorney present during any interrogation or interview. Third of all, I advised her if she could not afford an attorney, if she did not have any money, that the Court would have one appointed for her and, fourth, I

advised her that anything she said may and could be used against her in the event of a criminal trial.

Q Did she indicate to you that she heard and understood what you had said to her?

A Yes, sir, she did.

Q Did you ask her whether or not, having heard and understood that, she was willing to talk to you?

A Yes."

According to McCulloch, the above warnings were given to the defendant when they arrived at the prosecutor's office in Ocean County at 5:30 on the afternoon of December 31. The defendant was questioned by McCulloch intermittently from 5:30 until 9:15 P.M., when she was again given the proper *Miranda* warnings. These warnings were recorded at the beginning of the taped statement which was then taken. Significantly, the defendant's tone of voice on the tape recording took on an impatient quality in her responses in the following colloquy:

"Q You have an absolute Constitutional right to remain silent. Do you understand that?

A Yes.

Q Have you been warned of this right by me before?

A Yes.

Q Many times?

A About five.

Q If you answer your questions knowing of your right to remain silent, and your answers can or will be used against you in the event of this matter under investigation is tried in court. Do you understand that?

A Yes.

Q You have the right to consult with an attorney prior to any interrogation and to have counsel present during any investigation, do you also understand that?

A Yes.

Q If you wish to exercise this right to an attorney but you don't have the funds sufficient enough to pay him, the Court will appoint one for you, do you understand that?

A Yes.

Q Has anybody threatened you or promised you any reward in connection with the decision to answer any questions?

A No.

Q  In view of your answers to the questions that I have just asked you, do you wish to waive these rights and answer my questions?
A  Yes."

■ We are satisfied on our review of the record and our hearing of the tape recording that the State satisfied its burden of proving that the defendant was fully apprised of her constitutional rights as required by *Miranda* both at the commencement of the questioning on December 31 and, as the tape recording reveals, immediately prior to giving the statement in which she admitted killing her husband.

The defendant next contends that she did not "knowingly and intelligently" waive her constitutional rights. This argument encompasses the contention, argued by the defendant as a separate point, that the State failed to prove her statement of December 31 to be voluntary.

The defendant does not contend that she was mistreated by the police at any time; in fact, in her brief and at oral argument, she suggested that the courtesy of the police officers lulled her into a false sense of security. This suggestion is completely unfounded; there were no false overtures of friendship by the police who merely treated the defendant with simple courtesy. The defendant also contends that she was in a weakened condition during the questioning on December 31 due to her consumption of one and a half alcoholic drinks on the plane trip from Tennessee, the secret taking of a number of unidentified "pep pills" which she allegedly had hidden in her bra, pain in her abdomen, a headache, and nausea. She also testified that she had eaten only a part of a sandwich from the time she left Tennessee and that her will was overborne by photographs of her husband's body at the morgue shown to her by the police. She urges that the time of her questioning — New Year's Eve — and the failure of the authorities to bring her before a magistrate immediately upon arrival in Ocean County should be considered on this issue.

The two police officers who accompanied the defendant from Tennessee denied that she had been served any intoxicating beverages at any time. Due to the furtive manner in which she allegedly consumed the "pep pills" there was no corroboration of her taking them. Moreover, neither the composition of the pills nor the nature of their effect was ever established; the defendant stated only that they calmed her down but also elated her. The police officers testified that she appeared composed and in full control of her faculties. The pain in her abdomen, the headache, and the nausea, she testified, had persisted throughout the month of December; on cross-examination she stated that during the month she had these pains while out socially late at night and that she was able nevertheless to continue her activities and never sought medical attention. The police officers testified that on December 31 she made no complaints about her physical condition; it is noteworthy that when arraigned before a County Court judge about an hour after giving the statement she made no complaints. The police also testified that the defendant had two sandwiches and coffee on the plane trip from Tennessee and that she was offered food that evening at the prosecutor's office which she refused. The defendant admitted at the trial that she made no request for food. Defendant's allegation that she was shown the morgue pictures of her husband's body was categorically denied by the police. That there was a delay of four and a half hours in bringing the defendant before a judge is a factor to be considered but does not of itself render an otherwise voluntary confession inadmissible. *State v. Taylor,* 46 *N. J.* 316, 328, *certiorari* denied, 385 *U. S.* 855, 87 *S. Ct.* 103, 17 *L. Ed.* 2d 83 (1966) ; *State v. Jackson,* 43 *N. J.* 148, 167–168 (1964), *certiorari* denied, *Ravenell v. State,* 379 *U. S.* 982, 85 *S. Ct.* 690, 13 *L. Ed.* 2d 572 (1965). Our review of the record satisfies us that the trial judge correctly found the defendant's statement of December 31 to have been voluntarily given. Many of the factual arguments presented in the defendant's brief are un-

supported by the record and others paint an exaggerated picture of the circumstances testified to at the trial. Moreover, the defendant's testimony concerning the events surrounding the giving of her statement, as the trial judge found, was lacking in credibility.

Further, we are convinced that the State has satisfied its burden of showing that the waivers by the defendant of her rights after being warned by McCulloch at 5:30 P.M. and again as preserved in the tape-recorded statement made later that evening (both quoted above), were knowingly and intelligently made in circumstances free of coercive influences.

Accordingly, it was proper, both under *Miranda* and the pre-*Miranda* voluntariness tests, for the trial judge to admit the defendant's tape-recorded statements.

The next ground for reversal urged by the defendant is that her tape recorded statements of December 21 and December 22 were admitted into evidence in violation of the criteria for clarity and accuracy of tape recordings set forth in *State v. Driver*, 38 *N. J.* 255 (1962). We agree with Judge O'Connor, who presided at the trial, that the voices heard on the tapes are clear and that the words and sentences flow in an uninterrupted logical sequence. There is not the slightest basis for a suggestion that the judge or the jury could have had difficulty in hearing or understanding the tapes. We note that the December 21 and December 22 tape recordings are as clear as, if not clearer than, the December 31 tape to which no objection on this score is made. The detectives who took each tape both testified that the tapes accurately reproduced the questions asked and answers given at each interview. Furthermore, although the defendant took the stand on *voir dire*, she did not dispute the accuracy of the tapes nor did she point out any deletion or alteration. The extraneous noises on the tapes to which the defendant makes reference in her argument clearly are but background sounds and the result of the handing of the microphone from one person to another. These sounds in no way interfere

with the audibility or continuity of the tapes. In these circumstances, the trial court was well justified in admitting the tapes of December 21 and December 22.

 ▮ Defendant next asserts that the trial judge abused his discretion by permitting the three men to testify that they had sexual relations with the defendant both shortly before and after her husband's death. Evidence of defendant's sexual misbehavior shortly before the murder of her husband was highly relevant. The trial judge permitted this testimony only after a foundation had been established: (1) by the introduction of defendant's statement in which she admitted her intimacy with the men who later testified and in which she described the argument with her husband on the night of his death concerning her involvement with other men; (2) by the testimony of several witnesses who testified to statements by the defendant concerning problems in her marriage and her loathing of her husband. With this foundation the evidence of the defendant's sexual misconduct became "part of the fabric of the case." *State v. Anderson*, 35 *N. J.* 472, 483 (1961). Clearly, the evidence of defendant's affairs shortly prior to her husband's death was relevant to the solution of the puzzle which otherwise might arise in the jury's mind as to why a bride of but five weeks would slay her husband. Moreover, the testimony tended to rebut the inference of self-defense which defense counsel asked the jury to draw from the defendant's description of the killing in the statement of December 31.

The testimony concerning the defendant's sexual relations with one man two nights after her husband's death and with another on the weekend after the killing was probative of her state of mind towards her husband. Her actions were hardly those of a grief-stricken widow. See *State v. Gerce*, 22 *N. J.* 236, 246 (1956); *State v. Crivelli*, 89 *N. J. L.* 259 (*E. & A.* 1916). *Cf. State v. Mills*, 51 *N. J.* 277, (1968).

We find no merit in the defendant's argument that this probative value of the evidence was outweighed by a danger

of undue prejudice. See *State v. Anderson, supra; State v. Heathcoat,* 119 *N. J. L.* 33, 35 (*E. & A.* 1937); *State v. Crivelli, supra* 89 *N. J. L.,* at *pp.* 260–261; *State v. Fiore,* 85 *N. J. L.* 311 (*E. & A.* 1913); *State v. Abbatto,* 64 *N. J. L.* 658 (*E. & A.* 1900); see also *Rule 4, Rules of Evidence* effective September 11, 1967. The conclusion that probative evidence so central to the State's case should not be excluded because of its sordid overtones is consonant with the view expressed by this Court through Chief Justice Weintraub:

"That evidence [showing motive] is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself, if the evidence be believed, were inextricably entwined with the material facts." *State v. West,* 29 *N. J.* 327, 335 (1959).

See *State v. Baldwin,* 47 *N. J.* 379, 391, *certiorari* denied, 385 *U. S.* 980, 87 *S. Ct.* 527, 17 *L. Ed. 2d* 442 (1966). *Cf. Stoelting v. Hauck,* 32 *N. J.* 87, 103–105 (1960). We conclude that the trial judge properly exercised his discretion in admitting the evidence of defendant's sexual misconduct.

The next point raised in defendant's brief is that the trial court erred in admitting into evidence the defendant's bloodstained carcoat which she contends was illegally seized from her apartment under a defective search warrant. The warrant, issued by a County Court judge, was supported by an affidavit and testimony of Detective Herbert of the Ocean County Prosecutor's office. The affidavit and testimony clearly established probable cause for a belief that the defendant had been involved in the shooting of her husband and the defendant does not contend otherwise on this appeal. A two-fold attack is made on the warrant: (1) That the warrant failed to describe sufficiently the items to be seized; (2) that the affidavit and testimony of Detective Herbert did not show a probability that the items sought would be found in defendant's apartment. These points were raised initially on a pretrial motion to suppress evidence, which was denied, and

were renewed by an objection to the admission of the evidence at the trial.

█ The description contained in the warrant instructed the executing officer to search defendant's apartment and automobile for "weapon or weapons used in the crime of murder, *bloodstained clothes* or rags and other instruments or paraphernalia used in crime of murder." (Emphasis added.) It cannot be maintained that the phrase "blood-stained clothes" is not sufficiently specific to cover the seizure of the bloodstained carcoat. The other phrases in the description likewise were of adequate specificity to eliminate any room for the exercise of discretion by the searcher as to the items to be seized. See *Marron v. United States,* 275 *U. S.* 192, 48 *S. Ct.* 74, 72 *L. Ed.* 231 (1927). See also *Stanford v. State of Texas,* 379 *U. S.* 476, 486, 85 *S. Ct.* 506, 13 *L. Ed.* 2d 431, 437 (1965). To require a more detailed description in these circumstances would be to push the Fourth Amendment to absurdity.

█ It is true that the affidavit and testimony of Detective Herbert did not disclose whether the police had specific information that the items sought were actually in the defendant's apartment, *i. e.,* such as testimony that the items had been seen there. However, the requirement that a warrant be issued only upon a reasonable belief that the items sought might be found at the premises to be searched (*Dumbra v. United States,* 268 *U. S.* 435, 45 *S. Ct.* 546, 69 *L. Ed.* 1032 (1925) ) was satisfied by the common-sense inferences which arise from the totality of circumstances disclosed by the information before the issuing judge. The affidavit and testimony firmly established the probability that the defendant had shot her husband in their Cougar automobile in which bloodstains were found during an earlier search of the car to which no challenge is made. The bloodstains spattered about the car, coupled with the nature of the decedent's six bullet wounds, demonstrated the likelihood that the killer's clothing would have been stained by the victim's blood. It also is clear from the evidence offered to sup-

port the issuance of the warrant that the defendant returned to her apartment shortly after the slaying. Against this factual background, a reasonable man could not fail to perceive the great probability that evidence of the crime might have been carried to her apartment by the defendant. Moreover, it might be noted that as a practical matter, a showing of probable cause to believe that one has committed a murder ordinarily should be enough to justify a search of his house or apartment. To require the police to show more than the probability that the suspect has committed a murder would handcuff the police in their solving of homicides.

The case of *State v. Kline*, 42 *N. J.* 135 (1964), relied upon by the defendant, is readily distinguishable. In that case, there was no basis for an inference that the defendant's home in one municipality contained evidence of his possible gambling activities at a street address in another municipality. In *Kline* it was said:

"There was no proof of the nature of his involvement with the operation in Plainfield, or of any other facts or circumstances, from which it would be reasonable to assume that he carried gambling paraphernalia on his person or in his car, or kept them in his home [in Warren Township]." *Id.*, at *p.* 138.

Even assuming that a search in the factual context of a gambling case can be equated with the circumstances of a search in a murder case, here, as we already have said, the factual picture presented to the judge who issued the warrant clearly permitted, as reasonable, the assumption that the materials to be seized well might be found at the defendant's apartment.

There was no error in the denial of defendant's pretrial motion to suppress the evidence seized under the search warrant and the trial judge correctly overruled the defendant's objection at trial to the admission of the blood-stained carcoat.

Defendant's final argument is that she was returned illegally to New Jersey from Tennessee in violation of the.

extradition statutes of both states. The defendant concedes that any illegality in the manner in which she was brought into this state does not preclude her subsequent prosecution (see, *e. g., Frisbie v. Collins,* 342 *U. S.* 519, 72 *S. Ct.* 509, 96 *L. Ed.* 541, rehearing denied, 343 *U. S.* 937, 72 *S. Ct.* 768, 96 *L. Ed.* 1344 (1952) ; she urges, however, that the doctrine of *Wong Sun v. United States,* 371 *U. S.* 471, 83 *S. Ct.* 407, 9 *L. Ed.* 2d 441 (1963) should have been applied to exclude at trial her statement of December 31 which she alleges was a fruit of illegal police conduct in securing her presence in this state. Alternatively, she contends that the circumstances of her return to New Jersey clothed her with immunity from arrest under *N. J. S.* 2A:81–21 as a material witness.

▮▮▮▮▮ Neither the extradition statutes nor the material witness immunity statute[3] apply since it is manifest from the record that the defendant voluntarily consented to return to New Jersey. Before leaving Tennessee, she signed a certificate for the Tennessee authorities stating that "I . . . agree to return with Officers Lt. J. P. McCulloch and J. A. Irving from Chattanooga, Tenn., to Ocean County, New Jersey . . ."; no contention is made that her signature to this document was coerced. Lieutenant McCulloch and Detective Irving testified at trial that they offered her no inducement to return and that she freely consented to accompany them to New Jersey. Finally, the defendant testified on *voir dire* examination "Yes, I did" in response to a question whether she agreed to return with Lieutenant Mc-

---

[3] The material witness immunity statute, *N. J. S.* 2A:81–21, provides:

"If a person comes into this state *in obedience to a summons* directing him to attend and testify in this state he shall not, while in this state *pursuant to such summons,* be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this state under the summons." (Emphasis added.)

It is undisputed that defendant's return to New Jersey was not "in obedience to" or "pursuant to" a summons.

Culloch to New Jersey. In any event, even assuming that defendant's return to this state was not in compliance with the New Jersey and Tennessee extradition statutes, the illegality flowed only from technical requirements unrelated to elements of coercion and in no way infringed upon fundamental rights such as were ignored by the police conduct in *Wong Sun v. United States, supra,* where the warrantless arrest was found to be without probable cause. Moreover, we do not believe that the circumstances of defendant's return from Tennessee improperly induced her to make a statement, nor were the circumstances such as would taint the subsequently obtained statement. See *State v. Jackson,* 43 *N. J., supra,* at *pp.* 168–170.

The defendant has not contended that the verdict of the jury was against the weight of the evidence; nor could she successfully do so since the record amply supports the verdict returned by the jury. We are entirely satisfied that the defendant received a fair trial, free of prejudicial error. The arguments advanced on this appeal being devoid of merit, the judgment of conviction is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.