645 A.2d 111

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. STANLEY LEE TUCKER, DEFENDANT–
APPELLANT.

Argued February 15, 1994—Decided August 8, 1994.

*Claudia Van Wyk,* Deputy Public Defender II, argued the cause for appellant (*Susan L. Reisner,* Acting Public Defender, attorney).

*Larry R. Etzweiler,* Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

A jury convicted defendant of the 1987 murder of Patricia Warner. It also found him guilty of burglary, a violation of *N.J.S.A.* 2C:18–2a; theft, contrary to *N.J.S.A.* 2C:20–3a; and

possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4d. The trial court sentenced defendant to a life term with a thirty-year period of parole ineligibility on the murder conviction, and to a consecutive term of five years with thirty-months parole ineligibility on the burglary conviction. It imposed a concurrent five-year sentence on the theft conviction and merged the possessory offense with the murder conviction. The Appellate Division affirmed the judgment of conviction in all respects, 265 *N.J.Super.* 296, 626 *A.*2d 1105 (1993). We granted defendant's petition for certification, 134 *N.J.* 484, 634 *A.*2d 530 (1993), primarily to consider defendant's contentions that his incriminatory statements were the product of an illegal detention and that his December 2, 1987, confession to the homicide, admitted in evidence as part of the State's case, was taken in violation of his Sixth Amendment right to counsel.

I

We adopt and set forth the carefully detailed factual summary contained in the Appellate Division opinion:

On November 23, 1987, Patricia Warner was strangled, asphyxiated and stabbed. It is undisputed that defendant killed the victim and later discarded her body in a creek. Although defendant challenges the Law Division's decision admitting his confession, other evidence presented at trial clearly and overwhelmingly established his guilt. Among other things, these proofs consisted of the detailed account of an eyewitness, substantial physical evidence and defendant's own trial testimony.
* * *

In 1987, Patricia Warner was twenty-five years old and employed as a secretary. She resided in the second floor apartment of a two-family home owned by her parents. The house had been placed on the market for sale because the decedent was planning to relocate. At approximately 4:00 p.m. on November 23, 1987, the decedent's mother and brother attempted to visit the apartment in order to drop off some food. Although the decedent came to the door, the two were not permitted into the apartment. Upon returning with the decedent's father some

four hours later to perform carpentry work on the first floor apartment, Mrs. Warner heard someone "knocking" upon the decedent's door. Hearing no response, Mrs. Warner went upstairs and unsuccessfully attempted to gain entry into the apartment. She then left the building and from the sidewalk observed two men walking away with a radio. Mrs. Warner returned to the decedent's apartment where she saw an interior light suddenly dim.

On the next day, Mr. and Mrs. Warner met their real estate broker at the decedent's apartment. Using a key, the three entered the apartment where they found blood on the wall and inside the bathtub. The police were immediately summoned. Upon responding, the police discovered blood on the walls of the foyer and stairway. A "puddle" of blood was found in the bathtub. The police also noticed what appeared to be the broken blade of a steak knife on the floor of the bathroom. In addition, the bedroom had been "ransacked" and a television had been taken from the living room. By the entry to the kitchen, the police found a pail containing a "pinkish liquid."

Three days later, on November 27, 1987, the decedent's automobile was located on a public street several blocks from her apartment. A local resident told the police that she had recently seen the defendant, who she knew as her son's barber, standing next to the car with the door open. She later observed defendant walking toward the railroad tracks accompanied by another male who was having difficulty standing. Further investigation revealed that defendant lived on the same street that the automobile was found.

Defendant was arrested and transported to police headquarters where he was advised of his constitutional rights and questioned. Initially, defendant admitted that he knew the decedent, but denied burglarizing her apartment. He claimed that the decedent's boyfriend, Erk Drury, had borrowed her car and that he briefly accompanied Drury on a ride. Later that evening, defendant told the police that he had accompanied Drury to the decedent's apartment to borrow her car. He claimed that she refused and an argument developed between Drury and the decedent. According to defendant, he left and went to his aunt's house, where Drury, driving the decedent's automobile, subsequently picked him up.

Upon searching defendant's apartment, the police discovered a rusty knife with a wooden handle, two cable boxes, a television and bloodstained clothing. When confronted with this information, defendant claimed that he had purchased one of the cable boxes "on the street", but owned them both, and that he had cut his finger in a fall. When the officer expressed skepticism about the source of blood on his clothes, defendant recounted that the front passenger seat of the decedent's car was "all wet and bloody," thus soiling his clothing. However, defendant could

not explain why the bloodstains appeared on the front of his trousers. At this point, the interrogation terminated. Although defendant was advised that he would be charged with burglary and robbery, he agreed to speak to the officers the following day. Defendant remained in jail that night.

At 2:30 p.m. the next day, defendant was again advised of his constitutional rights and questioned. Defendant explained that he and Drury had returned to the decedent's apartment after borrowing her automobile. According to defendant, Drury met with the decedent alone. After a brief period, defendant joined them. On his way up to the second floor apartment, defendant asserted that he noticed blood on the wall and that Drury appeared to be perspiring and "out of breath." Defendant further related that he saw the decedent lying in the bathtub. At this point, defendant claimed that he mistakenly cut his finger with a pocket knife he had been carrying and soaked it in a bucket of water. He recalled helping Drury remove the decedent's body from the apartment and place it in the front passenger seat of her automobile. Drury allegedly drove off with the decedent's body, leaving defendant behind.

Defendant was then permitted to speak to his cousin, who was a police officer. After a brief conference, defendant agreed to lead the police to the decedent's body. Accompanied by the officers, defendant provided directions to a bridge in Hopewell Township. From the automobile, defendant told the police where they could find the decedent's body. Pursuant to defendant's detailed instructions, the police recovered the body in the creek below the bridge. The police discovered a "red cloth" knotted around the decedent's neck. Later that night, defendant gave the police a formal statement in which he essentially repeated what he had told them earlier in the day. The interview was eventually terminated because of the late hour, and defendant agreed to be questioned on the following day.

At noon, on November 29, 1987, defendant was transported from the holding cell, again apprised of his constitutional rights and questioned. Although defendant elaborated on his prior statements, he provided little additional information. The questioning continued throughout the day with numerous interruptions during which he was permitted to eat, smoke and use the bathroom facilities.

Questioning resumed at 9:00 a.m. the next morning. After being advised of his rights, defendant admitted for the first time that he had stolen the television and cable boxes from the decedent's apartment. Later that day, defendant was brought before a municipal court judge for his initial appearance on a complaint charging him with burglary and robbery. Although the proceedings were sound recorded, no transcript was prepared and the tapes were destroyed before this appeal was filed. In the complaint, the word "[r]etained" is circled in the area denoting "defense counsel information." Although this cryptic reference is other-

wise unexplained, information presented at a pretrial hearing indicates that defendant had employed David Rhoads, a private attorney, to represent him on unrelated drug charges approximately eight months before the homicide. Although the record is not entirely clear, it is reasonably apparent that defendant apprised the judge at the initial appearance of his prior retention of Mr. Rhoads on the narcotics indictment. In reality, defendant had paid only a fraction of Mr. Rhoads' [sic] initial retainer and was later assigned a public defender. As to the present charges, defendant formally applied for an attorney from the Public Defender's Office on December 4 and 5, 1987. The Public Defender subsequently retained Mr. Rhoads to represent defendant on these charges. The point to be stressed is that the record is barren of anything to suggest defendant sought the assistance of a public defender attorney or otherwise expressly invoked his right to counsel at the initial appearance on November 30, 1987.   * * *

On the next day, December 1, 1987, the police returned to defendant's apartment and seized additional items of evidence. Defendant's thirteen year old nephew, Jeffrey Tucker, was present and agreed to accompany the officers to police headquarters for questioning. Jeffrey was interrogated in the presence of his mother. He recounted that at 7:00 p.m. on November 23, 1987, he accompanied defendant to the decedent's apartment. They were invited in and an argument subsequently developed between defendant and the decedent. Defendant grabbed the decedent by the neck, tied her hands behind her back with an extension cord and pushed her into the bedroom. Then, in an enraged state, defendant "stuffed" a pink stocking down the decedent's throat and began strangling her, all in the presence of Jeffrey. After a brief struggle, defendant stabbed the decedent in the back and placed her in the bathtub. According to Jeffrey, defendant rummaged through the victim's purse and obtained what he thought were her car keys. Jeffrey related that the two left the apartment and unsuccessfully attempted to start the car. They returned to the apartment but the front door had locked behind them and defendant, using a screwdriver, was forced to pry it open. Upon gaining access to the apartment, defendant found the right set of keys and, with Jeffrey's assistance, stole the television, a cable box, two radios and a pair of binoculars. After transporting several of these items to defendant's apartment, the two returned, placed the decedent's body in the front seat of the car, drove to the Hopewell bridge, and defendant threw the victim "over the railing" into the canal. They later left the decedent's automobile parked on the defendant's street. Following the interview, Jeffrey was released to his parents' custody.

At approximately 9:00 a.m. the next day, December 2, 1987, defendant was transported from the jail to the special investigations unit of the Mercer County Prosecutor's office. After being advised of his rights and signing various waiver documents, defendant was told by the officers that they had secured Jeffrey's statement. Defendant then confessed that he had "cut [the decedent] and dumped

her body into [a creek] in Hopewell." He explained that the decedent had become so angered when he suggested that her boyfriend was a homosexual that she slashed his finger with a kitchen knife. Defendant claimed that he then left the apartment, but returned later with Jeffrey. According to defendant's statement, the decedent attacked him with a knife, but he was able to stab her with a screwdriver, cutting her "somewhere between the face and under the neck." He then tied her hands with an extension cord and "stuffed a piece of clot[h] or a bandanna" in her mouth.

In his statement, defendant recounted that he heard someone knocking at the door shortly after stabbing the victim. After the knocking stopped, defendant ascertained that the decedent was still alive. He then "pulled her by the wrists . . . to the bathroom and put her in the tub," before untying her hands. Defendant recounted that he and Jeffrey took a radio from her bedroom and later hid it under his porch. They then returned to the victim's apartment, pried open the door and found the decedent, who was still alive. The two removed the decedent's television, left the apartment, and sold it to someone "on the street." According to defendant, they then returned to the decedent's apartment where they found the victim at the "bottom of the steps." It was at this point that defendant inadvertently cut his finger and placed his hand in a pail of water near the stairway.

At approximately 6:30 a.m., defendant and Jeffrey placed the decedent's body in the front passenger seat of the automobile and drove to the Hopewell bridge. After discarding the body, they returned to defendant's apartment where they changed their clothing. They later parked the decedent's automobile a short distance from defendant's residence.

Defendant's statements were admitted into evidence at trial. So too, Jeffrey Tucker provided detailed testimony, graphically describing the events leading up to the homicide, defendant's strangling and stabbing of the victim, the subsequent theft of her belongings, and the "dumping" of her body into the canal beneath the Hopewell bridge. In addition, Jeffrey testified respecting defendant's plan to "frame" Drury for the killing. Defendant told Jeffrey that if the police should approach him, he was to provide a fabrication which placed upon Drury the responsibility for the murder. At a later date, defendant allegedly instructed Jeffrey to testify falsely at trial.

The State presented the medical examiner who performed the autopsy. She testified that she found a piece of cloth "[v]ery deep . . . into the [decedent's] throat covering her airway." She also indicated that the victim's external injuries included "multiple throat slashings[,] . . . a deep stab wound to the left side of the neck[,] . . . scraping on the right side of her forehead[,] . . . abrasions on her midchest[,] . . . a superficial stab wound [in the chest area] . . . [and] linear . . . abrasions on the right wrist." The stab wound on the neck was one to two inches deep, cutting "through the skin, subcutaneous tissues[,] . . . the internal jugular

vein and a branch of the carotid artery...." According to the medical examiner, a person inflicted with these injuries could survive only twenty or thirty minutes. She concluded that the cause of death was "acute asphyxia due to gagging[ ] stuffed inside [the decedent's] mouth ... [and] ligature strangulation." The "major contributing cause" of death was said to be "extreme blood loss due to the stab wounds of the neck and multiple throat slashings."

Defendant elected to testify. To some extent, his testimony reflected the description of the killing contained in his formal statement taken on December 2, 1987. According to defendant's testimony, he pushed the victim into her bedroom where he "tied her up" and forced "[s]ome type of silk material" into her mouth. Defendant related that he then "took [the decedent] to the bathroom[,] put her in the tub, ... picked up the knife, ... turned [his] head" and stabbed her one time. Defendant testified that he was "not sure" whether he had stabbed the decedent in the throat, but he knew he had stabbed her somewhere on her body. Defendant claimed that he never intended to kill the victim, and did so only accidentally.

[265 *N.J.Super.* at 302–09, 626 *A.*2d 1105 (alterations in original).]

## II

Defendant contends that the failure of the arresting officers to afford him a probable-cause hearing for approximately seventy-two hours after he was taken into custody violated his federal and State constitutional rights and required suppression of all, or at least some of, his statements to the police. In *Gerstein v. Pugh,* 420 *U.S.* 103, 95 *S.Ct.* 854, 43 *L.Ed.*2d 54 (1975), the Supreme Court determined that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to any extended restraint of liberty after a warrantless arrest. *Id.* at 125, 95 *S.Ct.* at 869, 43 *L.Ed.*2d at 72. The Court in *Gerstein* did not specify a time limit within which the determination of probable cause must occur. Recently, however, in *County of Riverside v. McLaughlin,* 500 *U.S.* 44, 111 *S.Ct.* 1661, 114 *L.Ed.*2d 49 (1991), the Court clarified its holding in *Gerstein,* stating that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein.*" *Id.* at 56, 111 *S.Ct.* at 1670, 114 *L.Ed.*2d at 63. The Court noted that if the probable-cause determination does not occur within forty-eight hours, "the burden shifts to the govern-

ment to demonstrate the existence of a *bona fide* emergency or other extraordinary circumstance." *Id.* at 57, 111 *S.Ct.* at 1670, 114 *L.Ed.*2d at 63. The Court acknowledged that states are free to consolidate probable-cause hearings with other pretrial proceedings, such as bail determinations, but cautioned that neither intervening weekends nor the time required to consolidate pretrial proceedings qualifies as an extraordinary circumstance. *Ibid.* Moreover, the Court observed that a probable-cause determination provided within forty-eight hours of arrest may not pass constitutional muster if the arrested person can prove that the determination of probable cause was delayed unreasonably. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, [or] a delay motivated by ill will against the arrested individual * * *." *Id.* at 56, 111 *S.Ct.* at 1670, 114 *L.Ed.*2d at 63.

Because *McLaughlin* was decided in May 1991 while defendant's appeal was pending before the Appellate Division, its holding applies retroactively to this appeal. *See Powell v. Nevada,* 511 *U.S.* ——, ——, 114 *S.Ct.* 1280, 1281, 128 *L.Ed.*2d 1, 5 (1994) (applying *McLaughlin* retroactively, and noting that " '[a] ... rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, ... not yet final' when the rule is announced." (quoting *Griffith v. Kentucky,* 479 *U.S.* 314, 328, 107 *S.Ct.* 708, 716, 93 *L.Ed.*2d 649, 661 (1987))). The State concedes that defendant suffered a violation of his constitutional rights, and that to have complied with the holding of *McLaughlin* the prosecution should have obtained a probable-cause hearing by noon of Sunday, November 29, 1987. The State argues, however, that although delay in obtaining a probable-cause hearing is a factor in determining the voluntariness of a confession, suppression is unnecessary unless a causal relationship existed between the challenged statements and the failure to afford defendant a prompt probable-cause determination.

As the United States Supreme Court has acknowledged, the issue of the appropriate remedy for a delay in determining probable cause was not resolved by *McLaughlin. Powell, supra,* 511 *U.S.* at ——, 114 *S.Ct.* at 1281, 128 *L.Ed.*2d at 7. In earlier cases the Supreme Court, asserting its supervisory authority over federal courts, held inadmissible confessions made by a defendant during a period of illegal detention. See *Mallory v. United States,* 354 *U.S.* 449, 455, 77 *S.Ct.* 1356, 1360, 1 *L.Ed.*2d 1479, 1483–84 (1957); *McNabb v. United States,* 318 *U.S.* 332, 344–45, 63 *S.Ct.* 608, 615, 87 *L.Ed.* 819, 826 (1943).

This Court consistently has declined to adopt the practice set forth in *Mallory.* See *State v. Barry,* 86 *N.J.* 80, 90–91, 429 *A.*2d 581, *cert. denied,* 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L.Ed.*2d 415 (1981); *State v. Jones,* 53 *N.J.* 568, 570–73, 252 *A.*2d 37, *cert. denied,* 395 *U.S.* 970, 89 *S.Ct.* 2122, 23 *L.Ed.*2d 759 (1969); *State v. Seefeldt,* 51 *N.J.* 472, 486, 242 *A.*2d 322 (1968); *State v. Taylor,* 46 *N.J.* 316, 328, 217 *A.*2d 1, *cert. denied,* 385 *U.S.* 855, 87 *S.Ct.* 103, 17 *L.Ed.*2d 83 (1966); *State v. Johnson,* 43 *N.J.* 572, 592–93, 206 *A.*2d 737 (1965), *aff'd,* 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882 (1966); *State v. Jackson,* 43 *N.J.* 148, 167–68, 203 *A.*2d 1 (1964), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *cf. State v. Worlock,* 117 *N.J.* 596, 621–25, 569 *A.*2d 1314 (1990) (rejecting contention that court must suppress voluntary post-arrest confession if defendant was arrested without probable cause).

Our cases hold that delay in affording a defendant a probable-cause determination is a factor that courts should weigh, in the totality of the circumstances, in determining whether a confession during the period of detention was voluntary. See *Barry, supra,* 86 *N.J.* at 90–91, 429 *A.*2d 581; *Seefeldt, supra,* 51 *N.J.* at 486, 242 *A.*2d 322; *Jackson, supra,* 43 *N.J.* at 167, 203 *A.*2d 1; *State v. Reyes,* 237 *N.J.Super.* 250, 261, 567 *A.*2d 287 (App.Div.1989). In assessing the significance of the delay between the time of Tuck-

er's arrest (noon on Friday, November 27, 1987) and his first court appearance (Monday, November 30, 1987), we note initially the uncontradicted testimony at Tucker's *Miranda* hearing that the then-prevailing practice in Trenton Municipal Court was to hold initial hearings on weekends *only* for defendants who had been charged with homicide (Tucker not having been charged with murder until the following Wednesday), a practice that under *McLaughlin, supra,* no longer is permissible. See 500 *U.S.* at 57, 111 *S.Ct.* at 1670, 114 *L.Ed.*2d at 63. We also note that the probable-cause hearing mandated by *Gerstein* and *McLaughlin* is not "accompanied by the full panoply of adversary safeguards—counsel, confrontation, cross-examination, and compulsory process for witnesses." *Gerstein, supra,* 420 *U.S.* at 119, 95 *S.Ct.* at 866, 43 *L.Ed.*2d at 68–69. The Court observed in *Gerstein* that "[t]he sole issue is whether there is probable cause for detaining the arrested person pending further proceedings," which can be "determined reliably without an adversary hearing" on "hearsay and written testimony." *Id.* at 120, 95 *S.Ct.* at 866, 43 *L.Ed.*2d at 69. Consistent with both *Gerstein*'s characterization of the required probable-cause determination and *McLaughlin*'s conclusion that its forty-eight-hour requirement applies during weekends, we note that our Committee on Criminal Practice has recommended that *Rule* 3:4–1(b) be revised in part to read as follows:

> If a complaint-warrant form * * * has been prepared, the law enforcement officer shall present the matter to a judge, or in the absence of a judge, a municipal court administrator or deputy court clerk who has authority to set bail for the offense charged without unnecessary delay but in no event later than 12 hours after arrest. That judicial officer shall determine whether there is probable cause to believe that the defendant has committed an offense.
>
> [Supreme Court Committee on Criminal Practice, *Report* 23–24 (1992–1994 Term).]

Thus, the proposed change in our practice intended to achieve compliance with *McLaughlin* contemplates an expedited probable-cause and bail determination, presumably in person or by telephone, by either a judge, a court clerk, or a court administrator, within twelve hours after arrest.

■   We are fully in accord with the Appellate Division's conclusion that

defendant would have remained in lawful detention had a probable cause hearing been conducted promptly. The circumstances known to the police were clearly sufficient to establish probable cause for defendant's continued detention. Defendant cannot fairly argue that he would have been released had the question of probable cause been decided by a judicial officer within 48 hours of his arrest.

[265 *N.J.Super.* at 315, 626 *A.*2d 1105.]

Consistent with the Appellate Division's conclusion, we note that if a probable-cause hearing had been afforded Tucker within forty-eight hours of his detention, the prosecution could have produced evidence demonstrating that defendant had been observed parking the victim's car on a Trenton street after the victim had been reported as missing. In addition, the State could have offered evidence obtained from execution of a search warrant at defendant's home, including two cable converter boxes (one of which was later determined to have been delivered by Comcast Cablevision to the victim's home), and articles of defendant's clothing containing bloodstains. Moreover, within forty-eight hours of his detention defendant had admitted that he was present in the victim's home with Erk Drury, that the victim had been injured, that he had seen blood on her face, and that he had assisted Drury in carrying the victim downstairs from her apartment and placing her into the front passenger seat of her automobile. Finally, defendant had also directed police to the location at which the victim's body had been discarded. We have no doubt that well in advance of the forty-eight-hour guideline for probable-cause determinations established by *McLaughlin* police officers had acquired evidence sufficient to establish probable cause to charge defendant with serious criminal offenses.

Because the requirement of a prompt probable-cause hearing is intended to prevent unlawful detention, our finding that abundant evidence existed to justify defendant's detention strongly supports the conclusion that the delay had little or no impact on the

voluntariness of defendant's statements. *See also United States v. Perez–Bustamante*, 963 *F.*2d 48, 53 (5th Cir.1992) (holding, post-*McLaughlin*, that incriminating statements made during non-coercive interrogation sixty hours after arrest and two days prior to first appearance before magistrate were voluntary and admissible).

The Appellate Division determined that none of defendant's statements should be suppressed because of the delay in defendant's initial court appearance:

> Measured against these standards, we are thoroughly convinced that the delay in affording defendant a probable cause determination did not taint his confessions. As we noted previously, the trial court found that all of defendant's statements were voluntary and the product of his free will. In terms of the Fifth Amendment's voluntariness standard, it is abundantly plain that the failure to provide a probable cause determination had no impact on defendant's state of mind.
>
> [265 *N.J.Super.* at 315, 626 *A.*2d 1105.]

We agree with that conclusion and accordingly reject defendant's contention that some of or all his statements should be suppressed on the basis of *McLaughlin*'s retroactive application to this appeal.

### III

#### A

Defendant contends that because the State did not sustain the burden of proving that he waived his Sixth Amendment right to counsel, which attached on November 30, 1989, at his first court appearance on the robbery and burglary complaint, his subsequent "waiver" of his right to counsel during police-initiated interrogation on December 2, 1987, was invalid, and the trial court should have suppressed his resultant confession to the homicide pursuant to the United States Supreme Court's holding in *Michigan v. Jackson*, 475 *U.S.* 625, 627, 106 *S.Ct.* 1404, 1407, 89 *L.Ed.*2d 631, 638 (1986).

In *Jackson*, decided approximately eighteen months prior to Tucker's arrest, the Supreme Court observed that the Michigan

arraignment in that case represented the initiation of formal legal proceedings against the defendants and therefore constituted the point at which the Sixth Amendment right to counsel attached. *Id.* at 629–30, 106 *S.Ct.* at 1407, 89 *L.Ed.*2d at 638; *see also Brewer v. Williams,* 430 *U.S.* 387, 398, 97 *S.Ct.* 1232, 1239, 51 *L.Ed.*2d 424, 436 (1977) (plurality opinion) ("[A] person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (quoting *Kirby v. Illinois,* 406 *U.S.* 682, 689, 92 *S.Ct.* 1877, 1882, 32 *L.Ed.*2d 411, 417 (1972))). Defendants Bladel and Jackson had both requested appointment of counsel at their arraignments, in the presence of police officers involved in the respective investigations. (The Appellate Division noted that the Michigan "arraignment" referred to in *Jackson* is essentially equivalent to a New Jersey defendant's first appearance, see *Rule* 3:4–2. 265 *N.J.Super.* at 320 n. 3, 626 *A.*2d 1105.) After the arraignments, the police officers in each case initiated further interrogation, preceded by *Miranda* warnings and defendants' agreement to respond without counsel, and both defendants gave incriminating statements.

Affirming the Michigan Supreme Court's decision that the post-arraignment statements should be suppressed, the United States Supreme Court rejected the State's contention that the defendants validly had waived their Sixth Amendment rights by making post-arraignment incriminatory statements after again being advised of their constitutional rights. *Jackson, supra,* 475 *U.S.* at 629–35, 106 *S.Ct.* at 1407–11, 89 *L.Ed.*2d at 638–42. The Court relied on *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378 (1981), a Fifth Amendment case, in which it had held that an accused person in custody who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made

available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 *S.Ct.* at 1885, 68 *L.Ed.*2d at 386. The Court in *Jackson* stated:

> Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis.

> \* \* \* \* \* \* \* \*

> Edwards is grounded in the understanding that "the assertion of the right to counsel [is] a significant event," 451 *U.S.* at 485, 68 *L.Ed.*2d 378, 101 *S.Ct.* 1880 [at 1885], and that "additional safeguards are necessary when the accused asks for counsel." *Id.* at 484, 68 *L.Ed.*2d 378, 101 *S.Ct.* 1880 [at 1884]. We conclude that the assertion is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment. We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid.

> [475 *U.S.* at 635–36, 106 *S.Ct.* at 1410–11, 89 *L.Ed.*2d at 642 (alteration in original) (footnote omitted).]

## B

Related to the issue of *Michigan v. Jackson*'s application to defendant's December 2, 1987, confession to the homicide is the State's argument that the Sixth Amendment is "offense-specific," *McNeil v. Wisconsin*, 501 *U.S.* 171, 175, 111 *S.Ct.* 2204, 2207, 115 *L.Ed.*2d 158, 166 (1991), and therefore the validity of police interrogation of defendant concerning the murder should not be affected by what occurred two days earlier at defendant's court appearance on robbery and burglary charges. As the trial record reveals, the police investigation uncovered critical evidence between defendant's first court appearance on November 30, 1987, and his interrogation two days later. After the weekend events, during which defendant had led police to the victim's body while maintaining that her friend Erk Drury was responsible for the

murder, the police investigators were obviously uncertain whom to charge with the homicide. Lieutenant Stankard, who led the investigation, testified that on Tuesday, December 1, 1987, he had returned to defendant's house with a second search warrant to look for, among other things, a piece of paper with Drury's phone number in Georgia that defendant said Drury had given him. While at the house he spoke with Jeffrey Tucker, defendant's nephew, who spoke with police at length and provided the first direct evidence of defendant's responsibility for the homicide. Jeffrey's statement prompted the police to question defendant again on December 2, 1987. Thus, the State argues against any rule that would insulate a defendant, following an initial court appearance on a charged offense, from police-initiated interrogation on a different offense.

In *McNeil, supra,* police arrested defendant for armed robbery, and at his first court appearance the court assigned an attorney to represent him. 501 *U.S.* at 173, 111 *S.Ct.* at 2206, 115 *L.Ed.*2d at 165. Later, police questioned defendant, still in custody, about an unrelated homicide, after first informing defendant of his *Miranda* rights. *Ibid.* After waiving his rights, defendant confessed to the homicide and subsequently was tried and convicted of murder. 501 *U.S.* at 174, 111 *S.Ct.* at 2206–07, 115 *L.Ed.*2d at 165–66. Distinguishing *Michigan v. Jackson,* the Supreme Court held that the defendant's assertion of his right to counsel during his court appearance on the robbery complaint did not preclude police-initiated interrogation concerning a totally unrelated homicide. 501 *U.S.* at 175–76, 111 *S.Ct.* at 2207–08, 115 *L.Ed.*2d at 166–67. The Court observed that "[t]he Sixth Amendment right * * * is offense specific" and "cannot be invoked once for all future prosecutions * * *." *Id.* at 175, 111 *S.Ct.* at 2207, 115 *L.Ed.*2d at 166.

However, other federal and state cases, some of which were decided after *McNeil,* recognize that the Sixth Amendment right to counsel for a charged offense cannot be separated from another offense that is "inextricably intertwined" or "extremely closely related" to the charged offense. *Cf. United States v. Kidd,* 12 *F.*3d 30, 33 (4th Cir.1993) ("In order to fall within this [related-offense] exception, the offense being investigated must derive from the same factual predicate as the charged offense."); *United States v. Carpenter,* 963 *F.*2d 736, 740 (5th Cir.1992) ("When the offenses are so closely related, the protections afforded by the Sixth Amendment * * * will extend even to those offenses with respect to which the government has not yet initiated formal charges."); *United States v. Hines,* 963 *F.*2d 255, 257 (9th Cir. 1992) ("An exception to the offense-specific requirement of the Sixth Amendment occurs when the pending charge is so inextricably intertwined with the charge under investigation * * * ."); *United States v. Cooper,* 949 *F.*2d 737, 743–44 (5th Cir.1991) (same); *People v. Clankie,* 124 *Ill.*2d 456, 125 *Ill.Dec.* 290, 294, 530 *N.E.*2d 448, 452–53 (1988) (asserting that Sixth Amendment rights of one formally charged with offense extend to offenses closely related and for which one is subsequently formally accused); *State v. Sparklin,* 296 Or. 85, 672 *P.*2d 1182, 1190 (1983) (holding, pre-*Jackson,* that defendant who requested counsel at arraignment on charges of using stolen credit card could not be interrogated by police after *Miranda* warnings concerning related assault on credit-card owner, although statements elicited concerning unrelated homicide charge were admissible); *In re Pack,* 420 *Pa.Super.* 347, 616 *A.*2d 1006, 1010–11 (1992) (relying on Pennsylvania Supreme Court's interpretation of Sixth Amendment right to counsel as applying to all offenses arising from same incident for which defendant is charged); *Upton v. State,* 853 *S.W.*2d 548, 555–56 (Tex.Crim.App.1993) (holding *McNeil* inapplicable and barring admissibility of statements incriminating defendant of murder

elicited by police after defendant was arraigned and obtained counsel on theft charges that State used to prove aggravating factor in capital-murder prosecution); *see also State v. Porter,* 210 *N.J.Super.* 383, 393, 510 *A.*2d 49 (App.Div.1986) (holding admissible incriminating statement concerning unrelated uncharged offense during police-initiated interrogation after *Miranda* warnings although defendant had been assigned counsel on charged offense).

■   Our view of the scope of the Sixth Amendment protection is consistent with the post-*McNeil* decisional law. If the offense under investigation is based on essentially the same factual context as the charged offense, assertion of the Sixth Amendment right to counsel on the charged offense should bar police-initiated interrogation on the related offense. Thus, if defendant were protected by the holding in *Jackson* on the basis of what transpired at his initial court appearance on the burglary and robbery charges, statements obtained by police two days later concerning the homicide—which had essentially the same factual predicate as the burglary and robbery charges and was inextricably related to those charges—would be inadmissible.

## C

To assess and explain adequately whether *Jackson* affects the admissibility of defendant's December 2, 1987, confession, however, we must supplement the procedural history and provide a broader context for the discussion that follows. Initially, we note that defense counsel did not contend at the *Miranda* hearing or at trial that defendant's December 2, 1987, confession to the homicide was inadmissible under *Michigan v. Jackson* because defendant had requested counsel at his court appearance two days earlier. The Assistant Prosecutor, however, referring to the information concerning defense counsel on the complaint forms that charged

defendant with burglary and robbery, and subsequently with murder, argued that defendant had not requested counsel at either his first or second court appearances and had voluntarily waived his constitutional rights. In sustaining the admissibility of defendant's statements at the conclusion of the *Miranda* hearing, the trial court made an oblique reference to *Michigan v. Jackson:*

> Now, I have also considered all of the documents that have been marked in evidence, both by the State and by the defense. I have reviewed them and find them to be consistent with the testimony, and I have also referred carefully to the cases of *State [v.] Porter,* 210 *N.J.Super.* 383 [510 *A.2d* 49] (App.Div.1986), and State of Michigan, petitioner against Robert Bernard Jackson and Michigan, petitioner, against Rudy Lidell. That case really is *Michigan [v.] Jackson,* [475 *U.S.* 625] 106 *S.Ct.* [1404].
>
> I have reviewed the requirements of the United States Supreme Court concerning any issues that might arise concerning a situation such as I have been listening to for the last several days, and the state requirements as contained in *Porter,* and find that they do not raise any red flags or any problems as far as the facts of this particular case are concerned.

■ Defendant's Appellate Division brief first raised the *Michigan v. Jackson* issue, asserting that at defendant's initial court appearance on November 30, 1987, defendant "already had retained counsel on unrelated drug charges" and "evidently told the municipal judge so when she asked him if he wanted an attorney on the new charges." Defense counsel apparently based that contention on the notations recorded on the bottom of the complaint form charging defendant with burglary and robbery. The State vigorously contests defendant's interpretation of those notations. (We have attached the robbery and burglary complaint form as an Exhibit to our opinion so that the basis for the disagreement can be better understood.) Unfortunately, when defense counsel in January 1991 first requested a transcript of the November 30, 1987, hearing in Trenton Municipal Court, the court clerk informed counsel that the tape had been destroyed because our Court Rules require that such sound recordings be retained for only three years. See *R.* 7:4–5(a).

Minimal evidence in the record relates to what might have transpired at defendant's November 30, 1987, court appearance. At the close of the *Miranda* hearing, defense counsel Rhoads endeavored to explain to the trial court his brief prior relationship with defendant, informing the court that defendant, in connection with a narcotics charge filed against him earlier in 1987, had paid Rhoads a fraction of his initial retainer and had been unable to make any further payment. Rhoads recalled that he "may have suggested [defendant] go to the [Public Defender]'s office, and he did." Rhoads specifically stated that on November 30, 1987, when defendant first appeared in Municipal Court on the burglary and robbery charges, he was not representing defendant on the narcotics charge. Rhoads offered in evidence at the *Miranda* hearing a letter he had written on December 4, 1987, to the Public Defender's Office, enclosing a substitution-of-attorney form for the narcotics case and setting forth the background of his relationship with Tucker. He explained to the court that he had written the letter because an Assistant Prosecutor had informed him that during Tucker's initial court appearance on the murder charge on December 2, 1987, Tucker apparently had stated to the court that Rhoads represented him on the narcotics charge.

In addition, an investigator from the Mercer County Public Defender's office testified at the *Miranda* hearing that he had visited defendant on December 2, 1987, at the Mercer County Detention Center to conduct an initial interview; that sometime earlier that day Tucker had requested representation from the Public Defender's Office; and that the file contained no request for representation dated earlier than December 2, 1987.

No other testimony at the *Miranda* hearing bears on the events that transpired at defendant's November 30, 1987, court appearance, except that we note the testimony of the investigating Trenton police officers that they had not attended that hearing nor had they been informed of what had occurred. Thus, to establish

whether defendant requested an attorney on November 30, 1987, both counsel rely primarily on the notations at the bottom of the face of the burglary/robbery complaint under the heading "Prosecuting Attorney and Defense Counsel Information." We note that adjacent to the heading "Defense Counsel" five rectangular boxes appear with the headings "None," "Retained," "Public Defender," "Assigned," and "Other." On the complaint form, a "loop" beginning and ending in the box entitled "None" circles the word "Retained" in the adjacent box. Defense counsel argues that "[t]he record of arraignment indicates that counsel is 'Retained' and contains no indication of waiver." Before the Appellate Division the State conceded that the "loop" around the word "Retained" signified an intention by the court official who filled out the form to check the box marked "Retained." The Appellate Division agreed, but was unwilling to regard the notation on the complaint form as an adequate indication that defendant had asserted his Sixth Amendment right to counsel:

> Defendant's argument that he invoked his right to counsel is predicated solely on demarcations on the face of the complaint. In the portion dealing with "[d]efense counsel information," the box marked "retained" is circled. We view this scant reference to counsel as too slim a reed upon which to rest defendant's present assertion that he requested the assistance of an attorney. The best that can be said is that after the municipal court judge advised defendant of his right to counsel, Tucker declined the appointment of an attorney on the basis that he had hired a lawyer to represent him some eight months earlier on unrelated drug charges. It is undisputed that defendant made no effort to contact Mr. Rhoads or to procure the services of another lawyer. Only after defendant was formally charged with murder did he seek the assistance of a public defender attorney. Mr. Rhoads' [sic] prior representation of defendant on the drug charges clearly did not extend to the subsequent complaints charging Tucker with burglary, robbery and murder. * * *.

> We thus find no basis in the record for defendant's claim that he invoked his right to an attorney at the initial appearance.

> [265 *N.J.Super.* at 327–28, 626 *A.*2d 1105 (alteration in original).]

Before us, the State asserts that its argument before the Appellate Division was based on a misunderstanding of the nota-

tions on the complaint form, and it now contends that the unusual "loop" was intended to check the box entitled "*None*," and inadvertently circled the word "Retained." To support that argument, the State notes that adjacent to the heading "Prosecuting Attorney," a "loop" begins and ends in the box entitled "none," but encircles the word "State." The State argues persuasively that the official making the notations concerning "Prosecuting Attorney" must have intended to check "None," observing that "[i]n Mercer County * * * the State was almost always unrepresented at initial appearances in the municipal court * * * [and] if the State had been represented[, it] would have been by a County Prosecutor rather than by a State deputy attorney general." By analogy, the State argues that just as the clerk's "loop" intended to check "None" but inadvertently circled "State" on the portion of the form concerning the Prosecuting Attorney, so too the official that circled the word "Retained" adjacent to Defense Counsel did so inadvertently, the intent having been to check the box marked "None."

We agree with the State's contention, not so much because of the mysterious trajectory of the loops but because we take judicial notice, *Evid.R.* 201, of the generalized understanding among municipal court clerks and judges—an understanding we have verified through the Administrative Office of the Courts—that the boxes in question are checked only to indicate whether a prosecuting attorney or defense counsel actually *appeared* in court. Nothing in the record suggests, nor has it been argued, that counsel representing defendant appeared at the November 30, 1987, court appearance, and we know of no basis not to accept the Attorney General's representation that the State invariably was unrepresented at such hearings. Accordingly, we are persuaded that the notations on the complaint form should be understood to indicate that neither the State nor defendant was represented by counsel

at the hearing, and those notations have no bearing on whether defendant asserted his Sixth Amendment right to counsel.

■ Defendant's reliance on *Michigan v. Jackson*, however, does not hinge entirely on whether defendant can demonstrate that he asserted his Sixth Amendment right to counsel at his initial court appearance on November 30, 1987. Defendant argues alternatively, relying on *Jackson*, that "it is the State that has the burden of establishing a valid waiver." *Jackson, supra*, 475 *U.S.* at 633, 106 *S.Ct.* at 1409, 89 *L.Ed.*2d at 640. Defendant reasons from that principle that even without proof that he asserted his Sixth Amendment right to counsel at his initial appearance, he remains entitled to the protections afforded by *Jackson* unless the State can sustain the burden of proving a knowing and voluntary waiver of the Sixth Amendment guarantee.

The State concedes that scant precedent exists on the issue of burden of proof, but argues that the burden should be borne generally by defendants who possess first-hand knowledge of whether they specifically requested counsel during court appearances. Typically, as in *Jackson, supra*, and *McNeil, supra*, the issue is uncontested, no dispute existing concerning whether the defendant specifically rejected counsel during a court appearance. If our practice in New Jersey were relatively uniform on this issue, with defendants almost invariably requesting counsel when informed of Sixth Amendment rights during their initial court appearance, see *Rule* 3:4-2, we would undoubtedly find persuasive the argument in favor of a presumption that counsel was requested, with the result that the broad protection of *Jackson* would apply unless the State could prove a knowing and voluntary waiver of the Sixth Amendment right.

■ Our practice, however, is not uniform on the point. As is suggested by *Rule* 3:4-2 and by the *Bench Book for Municipal*

*Court,* the practice in Municipal Courts at a defendant's first appearance after the filing of a complaint is for the court to inform the defendant of the right to retain counsel and, if indigent, of the right to have counsel furnished without cost. *See* David Schepps & Samuel Serata, *Bench Book for Municipal Court* C–2–1 to C–2–3 (3d ed. 1986). Generally, defendants are not requested to indicate affirmatively whether they desire to retain counsel or to have counsel furnished. Although the *Rule* directs the court to have indigent defendants complete forms requesting appointment of counsel during their first appearance, the customary practice is that defendants fill out such forms in the county jail after their initial court appearance.

That practice contrasts sharply with the procedures used in the Central Judicial Processing (CJP) courts now functioning in a number of urban counties, in which Municipal Court first appearances take place at a centralized court in the county courthouses. Originally authorized on a trial basis in January 1981 by the Chief Justice, the CJP courts now function in Hudson, Essex, Camden and Union counties, and provide a forum for prosecutorial screening of cases and early case management. See *1986 Judicial Conference of New Jersey, Supreme Court Task Force on Speedy Trial 1980–1986,* at 17–18; *Approved Standards for the Operation of the New Jersey Criminal Division of Superior Court* Oct. 20, 1992, 3–4. In the CJP courts, forms requesting assigned counsel generally are completed by defendants prior to their initial court appearance, and at that court appearance counsel from the public defender's office are generally available to provide representation. In the CJP courts, as an essential pre-condition of effective case management, defendants are presumed to have asserted their expectation to be represented by counsel, and counsel are routinely provided.

In view of their significance to this appeal, we take judicial notice of the specific facts concerning the general practice at first

court appearances following the filing of a complaint both in Municipal Courts and CJP courts, *Evid.R.* 201, and have independently verified their accuracy through the Administrative Office of the Courts. One apparent consequence of the difference in procedures is that defendants whose first appearance occurs in CJP courts will gain the protection of the holding of *Michigan v. Jackson*, their assertion of the right to counsel at such hearings being readily verifiable and virtually automatic. In contrast, defendants whose first appearance occurs in Municipal Courts generally are not requested to indicate to the court whether they intend to retain or request appointment of counsel, with the result that police officers assigned to their cases may assume that police-initiated interrogation preceded by *Miranda* warnings remains constitutionally permissible.

We are persuaded that that disparity should cease. We will request our Criminal Practice Committee to undertake an expedited review of the procedures at first appearances to determine whether *Rule* 3:4-2 should be revised to require all defendants, after being informed of their Sixth Amendment rights, to state whether they desire counsel. The Committee will also consider the related question of providing adequate records documenting such requests for counsel, as well as retention of sound recordings of such proceedings for more than three years. Assuming that the Committee recommends such a revision in the *Rule*, we envision that the uncertainty surrounding application of *Michigan v. Jackson* would be substantially eliminated. Defendants asserting their right to counsel could not be subject to police-initiated interrogation even after *Miranda* warnings, in the absence of a knowing and voluntary waiver of their Sixth Amendment rights, which the State would be required to prove.

On this record, we find no evidence indicating that defendant asserted his Sixth Amendment right to counsel at his first court

appearance on November 30, 1987. Moreover, based on what we reliably understand to be the general practice in Municipal Courts during first appearances, we are unwilling to recognize a presumption that defendants generally assert such right to counsel at first appearances, thereby requiring the State to prove waiver to gain admissibility of post-hearing statements made pursuant to police-initiated interrogation. Such a presumption would be substantially inconsistent with the prevailing practice. Accordingly, we conclude that the admissibility of defendant's December 2, 1987, confession to the homicide, pursuant to police-initiated interrogation preceded by *Miranda* warnings, is not barred by *Michigan v. Jackson*.

## IV

Defendant also argues that notwithstanding our disposition of the *Michigan v. Jackson* issue, his December 2, 1987, confession to the homicide should be held inadmissible based on the principles underlying our holding in *State v. Sanchez*, 129 *N.J.* 261, 609 *A.*2d 400 (1991), contending that the rule of *Sanchez* should be extended to protect defendants from police-initiated custodial interrogation from the time of the first court appearance following the filing of a complaint.

In *Sanchez,* the defendant had been indicted by a grand jury for homicide and unlawful possession of a weapon, but had not been apprehended or arrested prior to his indictment. Approximately three months after the indictment, officers from the Passaic Police Department learned that defendant was in custody at New York's Rikers Island Prison on unrelated charges. Two detectives traveled there to interrogate him. According to the officers' version of the encounter, accepted by the trial court at the *Miranda* hearing, the officers first administered *Miranda* warnings to the defendant, immediately following which Sanchez spontaneously

acknowledged committing the homicide: " 'I know why you are here.' Pointing to his mouth, defendant said: 'I had to get him back for this. He knocked my tooth out three days before I stabbed him.' " *Id.* at 263, 609 *A.*2d 400. The defendant then agreed to furnish a written statement, first reading and initialing a *Miranda* warning form and signing a waiver of rights. In a signed statement, Sanchez admitted responsibility for the homicide. The officers had not informed him that he previously had been indicted for the crime. Defendant was later tried and convicted on both counts of the indictment, and his convictions were affirmed by the Appellate Division. *Id.* at 263–64, 609 *A.*2d 400.

On appeal, this Court reversed the defendant's conviction. We observed that New Jersey's traditional commitment to the right to counsel required that we construe article 1, paragraph 10 of the State Constitution to provide greater protection than that afforded under the federal constitution as interpreted by the United States Supreme Court in *Patterson v. Illinois*, 487 *U.S.* 285, 108 *S.Ct.* 2389, 101 *L.Ed.*2d 261 (1988). *Sanchez, supra*, 129 *N.J.* at 274–76, 609 *A.*2d 400. Accordingly, we held that after a defendant has been indicted, administration of *Miranda* warnings during police-initiated interrogation is not adequate to elicit a knowing and voluntary waiver of the right to counsel guaranteed by the State Constitution. Justice Pollock, writing for a unanimous Court, explained the rationale for our holding:

> The return of an indictment transforms the relationship between the State and the defendant. By obtaining the indictment, the State represents that it has sufficient evidence to establish a *prima facie* case. Once the indictment is returned, the State is committed to prosecute the defendant. From that moment, if not before, the prosecutor and the defendant are adversaries. Questioning the accused can be only "for the purpose of buttressing * * * a prima facie case." The spotlight is on the accused. Under those circumstances, the perfunctory recitation of the right to counsel and to remain silent may not provide that defendant with sufficient information to make a knowing and intelligent waiver. Such a recitation does not tell the defendant the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's interests. Those steps include pretrial motions such as those to test the sufficiency of the

indictment or to suppress illegally-seized evidence. They also include the negotia-
tion, subject to the approval of the court, of a plea agreement. Given the
adversarial nature of their relationship, for the State's representatives to communi-
cate adequately that information to an indicted defendant would be difficult, nigh to
impossible. As a general rule, after an indictment and before arraignment,
prosecutors or their representatives should not initiate a conversation with defen-
dants without the consent of defense counsel.

> [*Sanchez, supra,* 129 *N.J.* at 276–77, 609 *A.*2d 400 (alteration in original)
> (citations omitted) (quoting *People v. Settles,* 46 *N.Y.*2d 154, 412 *N.Y.S.*2d 874,
> 878, 385 *N.E.*2d 612, 616 (1978).]

Although a sharply divided Supreme Court in *Patterson* reached
a different conclusion in interpreting the Sixth Amendment to the
federal constitution, the reasoning of the dissenting members
closely adheres to the views expressed by this Court in *Sanchez.*
The defendant in *Patterson* was a gang member who had been
involved in a fight with a rival gang, in the course of which a
young man had died. After being arrested and waiving his
*Miranda* rights, the defendant denied knowledge of events con-
cerning the homicide but provided the police with a statement
concerning an earlier fight. Held in custody while the investiga-
tion proceeded, Patterson—unlike the defendant in *Sanchez*—was
informed by police officers two days later that he and other gang
members had been indicted for murder. On learning that one
gang member had not been indicted, defendant asked: " '[W]hy
wasn't he indicted, he did everything?' " 487 *U.S.* at 287–88, 108
*S.Ct.* at 2392, 101 *L.Ed.*2d at 269 (alteration in original) (quoting
appendix).

Before the defendant could make further statements, a police
officer handed him a *Miranda* waiver form, reading the warnings
aloud. The defendant initialed each warning, signed the waiver
form, and gave a detailed statement outlining his role and that of
other gang members in the homicide. Later that day, following
further *Miranda* warnings, the defendant gave another incrimina-

ting statement about the homicide. *Id.* at 288–89, 108 *S.Ct.* at 2392–93, 101 *L.Ed.*2d at 269–70.

The Supreme Court declined to suppress the defendant's statements, concluding that the administration of *Miranda* warnings had made the defendant "sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel[.]" *Id.* at 292–93, 108 *S.Ct.* at 2395, 101 *L.Ed.*2d at 272. Dissenting, Justice Stevens emphasized that the return of an indictment fundamentally alters the relationship between the State and a defendant, and expressed the view that *Miranda* warnings were not a sufficient basis to elicit a waiver of an indicted defendant's Sixth Amendment right to counsel:

> The return of an indictment, or like instrument, substantially alters the relationship between the state and the accused. Only after a formal accusation has "the government * * * committed itself to prosecute, and only then [have] the adverse positions of government and defendant * * * solidified. *Kirby [v. Illinois]*, 406 *U.S.* [682,] 689, 32 *L.Ed.*2d 411, 92 *S.Ct.* 1877 [1882] [ (1972) ]. Moreover, the return of an indictment also presumably signals the government's conclusion that it has sufficient evidence to establish a prima facie case. As a result, any further interrogation can only be designed to buttress the government's case; authorities are no longer simply attempting " 'to solve a crime.' " *United States v. Mohabir*, 624 *F.*2d 1140, 1148 (2d Cir.1980) (quoting *People v. Waterman*, 9 *N.Y.*2d 561, 565 [216 *N.Y.S.*2d 70, 72], 175 *N.E.*2d 445, 447 (1961); see also *Moran v. Burbine*, 475 *U.S.* [412,] 430, 89 *L.Ed.*2d 410, 106 *S.Ct.* 1135 [1145–46] [ (1986) ]. Given the significance of the initiation of formal proceedings and the concomitant shift in the relationship between the state and the accused, I think it quite wrong to suggest that *Miranda* warnings—or for that matter, any warnings offered by an adverse party—provide a sufficient basis for permitting the undoubtedly prejudicial—and, in my view, unfair—practice of permitting trained law enforcement personnel and prosecuting attorneys to communicate with as-of-yet unrepresented criminal defendants.
>
> [*Id.* 487 *U.S.* at 306–07, 108 *S.Ct.* at 2402, 101 *L.Ed.*2d at 281 (Stevens, J., dissenting).]

We readily acknowledge that the principle underlying our holding in *Sanchez* could logically be extended to apply to an earlier stage of criminal proceedings. Defendant argues that *Sanchez*

should apply from the first court appearance following the filing of the complaint, noting that that event signals "the initiation of adversary judicial proceedings" and thus the attachment of the Sixth Amendment right to counsel. See *United States v. Gouveia,* 467 *U.S.* 180, 187, 104 *S.Ct.* 2292, 2297, 81 *L.Ed.*2d 146, 153 (1984); *Kirby v. Illinois,* 406 *U.S.* 682, 689, 92 *S.Ct.* 1877, 1882, 32 *L.Ed.*2d 411, 417–18 (1972). No one can dispute, however, that at the time of the first court appearance the State's investigative effort generally is at a preliminary stage, and the police may still be attempting, as in this case, to solve the crime. We also are well aware that at the time of the first appearance the State's decision to prosecute has not solidified. *See* William T. Pizzi, *Waiver of Rights in the Interrogation Room: The Court's Dilemma,* 23 *Conn.L.Rev.* 229, 235 (1991) ("In many felony cases, the investigation into the crime will \* \* \* only be beginning [at the defendant's first appearance] and there will be no commitment on the part of the state to prosecute \* \* \* until much later."). Statistically, roughly one-half of all criminal complaints proceed to indictment. The remainder are either dismissed, downgraded, or diverted to Pre–Trial Intervention. Thus, the adversarial relationship between the State and a defendant is not the same at the time of first appearance as it is after indictment.

Our research reveals that two other state courts adhere to a rule analogous to our holding in *Sanchez,* but no jurisdiction to our knowledge has applied the *Sanchez* principle to a stage earlier than the return of an indictment. See *State v. Liulama,* 9 *Haw.App.* 447, 845 *P.*2d 1194, 1203–04 (1992) (following *Sanchez* and rejecting *Patterson* ); *People v. Settles,* 46 *N.Y.*2d 154, 412 *N.Y.S.*2d 874, 878, 385 *N.E.*2d 612, 616 (1978) (holding that "criminal defendant under indictment and in custody may not waive his right to counsel unless he does so in the presence of an attorney").

Ultimately, however, we conclude that we should not extend our holding in *Sanchez* to defendant's first court appearance for a more basic reason. We generally apply our State Constitution under circumstances, as in *Sanchez*, in which we are convinced that it should afford greater protection to our citizens than is afforded by the federal constitution, and support our conclusion that greater protection is appropriate on the basis of constitutional text, legislative history, state traditions, or other factors. See *State v. Hunt*, 91 *N.J.* 338, 364–68, 450 *A.*2d 952 (1982) (Handler, J., concurring). With respect to the protection of the right to counsel at the time of a defendant's first court appearance following the filing of a complaint, we are persuaded that the federal constitution's safeguards, as defined in *Michigan v. Jackson*, *supra*, are entirely adequate. However, we believe our own procedures require enhancement to afford defendants the full measure of the protection guaranteed by *Jackson*. As noted, *supra* at 285, 645 *A.*2d at 124, we are directing the Criminal Practice Committee to undertake an expedited review of *Rule* 3:4–2 to determine whether amendments should be adopted that would require all defendants at first court appearances to indicate whether they are asserting their right to counsel or requesting the appointment of counsel. That modification of our procedure would afford all defendants who assert the right to counsel the protection from police-initiated interrogation afforded by *Jackson*, and that protection would not differ significantly from what would be achieved by an expansion of *Sanchez*. Whenever possible, we endeavor to harmonize our interpretation of the State Constitution with federal law. See *Hunt*, *supra*, 91 *N.J.* at 345, 450 *A.*2d 952. On this issue, we find no deficiency in the protection afforded under the federal constitution and decline to apply our holding in *Sanchez*, based on our State Constitution, to defendant's court appearance on November 30, 1987.

We add two additional observations. We perceive no substantial difference between the procedure followed by the Trenton police between defendant's arrest and his initial court appearance on November 30, 1987, and the revised procedure recommended

by the Criminal Practice Committee to comply with the Supreme Court's holding in *McLaughlin, supra.* The Committee has recommended a bail and probable cause determination by a judge or judicial officer within twelve hours of arrest, and a first court appearance within seventy-two hours. See Supreme Court Committee on Criminal Practice, *Report* 22–25 (1992–1994 Term). Although defendant's bail was not set until his first appearance, which occurred approximately seventy-two hours after arrest, a relevant probable-cause determination was made by a judge within six hours of defendant's arrest in connection with the issuance of a warrant to search defendant's home. Although the focus of a probable-cause determination to support a search warrant is different from the determination of probable cause to arrest and detain, the analogy is obvious. As noted, *supra* at 274, 645 *A.*2d at 118, a probable-cause determination during the weekend would surely have resulted in defendant's continued detention.

█ Finally, we note that the record of the *Miranda* hearing does not suggest that the Trenton police used improper or coercive methods in their interrogation of defendant. Although the police were confronted at first with a missing victim, and subsequently with an unsolved homicide, the police officers' interrogation of defendant was unexceptional. The Appellate Division has carefully summarized the evidence at the *Miranda* hearing:

> At the pretrial *Miranda* hearing, the circumstances concerning all of defendant's statements were carefully examined. From the evidence adduced at that hearing, there is no dispute that defendant was first advised of his constitutional rights, and waived them in writing before each and every interrogation. Moreover, he was separately advised of his rights and signed separate waiver forms for each of the three formal statements which he agreed to provide. Upon all occasions, defendant appeared to be sober, alert, attentive, comprehending, and devoid of stress. He was able to read and write, and did read the warnings and waiver aloud to demonstrate his comprehension of them, and had no difficulty in doing so.

> When questioned by the police, defendant never requested an attorney, and never indicated that he was represented by counsel. Defendant was afforded all courtesies, including breaks for food, coffee, cigarettes, and use of facilities. Only once did defendant ask to see anyone—namely his cousin—and that request was promptly granted.

Defendant was never threatened, implicitly or explicitly. At all times, only one officer, or rarely, three officers were present for interrogation, or for witnessing his signature, thus avoiding the appearance that the police were attempting to overpower him. Nor was defendant promised any reward for his cooperation. Nevertheless, defendant was always willing, and sometimes eager, to speak with the police.

The trial court found that all of defendant's statements were voluntary. Specifically, the court concluded that "the police acted in a very professional manner[,] . . . and . . . scrupulously protected the rights of the defendant." The court found "beyond a reasonable doubt" that defendant's statements were voluntary, and were given "after knowing and intelligent waivers." Our review of the hearing transcript supports these conclusions. The findings made "could reasonably have been reached on sufficient credible evidence present in the record." *State v. Johnson*, 42 *N.J.* 146, 162 [199 *A.*2d 809] (1964).

[265 *N.J.Super.* at 310–11, 626 *A.*2d 1105 (alterations in original).]

Accordingly, we sustain the admissibility of defendant's December 2, 1987, confession to the homicide.

## V

■ Defendant argues that the trial court erred in failing to instruct the jury on aggravated and reckless manslaughter as lesser-included offenses. Defendant asserts that a rational basis in the evidence existed to support a jury finding that the victim was stabbed after she died from asphyxiation and that defendant's conduct in forcing the gag into the victim's mouth was reckless rather than purposeful.

The medical examiner testified at trial that the victim had sustained multiple throat slashings, a deep stab wound to the left side of the neck, and a superficial stab wound in the midchest. The victim's carotid artery was severed, the anterior jugular vein was cut and a deep jugular vein was cut. He testified that "the stab wounds of the neck and multiple throat slashings" resulted in "extreme blood loss," which constituted "a major contributing cause of [death]."

We find defendant's contention to be meritless, and agree with the Appellate Division's conclusion that the record did not require an instruction on aggravated or reckless manslaughter:

> Applying these principles, we are satisfied that the evidence did not provide a rational basis for instructing the jury on aggravated or reckless manslaughter. We recognize that asphyxiation was one of the causes of death and that there was some evidence that the stabbing took place sometime thereafter. Having said this, the evidence provides scant support for defense counsel's assertion that the stab wounds were inflicted after death. On the contrary, the medical examiner testified that "the stab wounds of the neck and multiple throat slashings" resulted in "extreme blood loss" which constituted "a major contributing cause of [death]." We view it as sheer speculation, rather than an inference reasonably derived from the medical examiner's testimony, that the stab wounds may have been inflicted after death. Moreover, Jeffrey's eyewitness account of the killing clearly established that the gagging and stabbing of the decedent were essentially contemporaneous acts or, at the very least, related parts of a continuous course of conduct. Defense counsel's present attempt to dissect defendant's conduct into discrete, compartmentalized and independent acts is not supported by the evidence.

[265 *N.J.Super.* at 331, 626 *A.2d* 1105.]

## VI

While defendant's appeal was pending before the Appellate Division, that court granted defendant's motion for a limited remand hearing in the Law Division to establish a record on defendant's claim that trial counsel rendered ineffective assistance in failing adequately to investigate defendant's low intelligence and possible mental retardation. At the hearing, the trial court heard testimony from defendant's trial counsel, and concluded that counsel had performed competently and adequately. During the remand hearing, the trial court rejected defense counsel's attempt to introduce expert testimony concerning defendant's alleged mental retardation at the time of that hearing, which was approximately two-and-one-half years after defendant's trial. Defendant now contends that the trial court's refusal to permit such expert testimony was erroneous, and denied defendant due process of law.

The focus of the testimony at the remand hearing was on defense counsel's attempt to engage Dr. Gerald Cooke, an experienced clinical psychologist, to assist in defendant's defense. Dr. Cooke had examined defendant in January 1980 in connection with a homicide charge concerning the death of defendant's three-year-

old son, Jesse. On that occasion, Dr. Cooke had rendered a report in which he had concluded:

> Tucker certainly acted recklessly and negligently, but did not, in my opinion, knowingly and purposely try to cause serious injury or death to Jesse. Rather he showed poor control of his anger as an outgrowth of his retardation, and poor judgment and a lack of child rearing skills in the manner in which he attempted to discipline Jesse.

Cooke also expressed the view at that time that defendant could not adequately read or comprehend the *Miranda* warnings, "particularly if he were under stress or agitated."

At the remand hearing, defense counsel Rhoads testified that he had obtained permission from the Regional Public Defender's office to have defendant examined by a psychologist, and the head of that office had recommended Dr. Cooke. Rhoads testified that he had asked Dr. Cooke to explore competency for trial, diminished capacity, and defendant's "ability to understand," with emphasis on *Miranda* warnings. Dr. Cooke rendered a report dated May 25, 1989, that read as follows:

> On 5/17/89, I conducted a Psychological evaluation of your client, Stanley Tucker. The evaluation consisted of an interview, history review of records and a battery of psychological tests. The results of the evaluation lead to a diagnosis of a Mixed Personality Disorder. Mr. Tucker also falls into the Dull–Normal Range of intellectual functioning. There is no evidence of psychosis.
>
> Mr. Tucker understands the charges against him, the function of courtroom personnel, the possible legal strategies and the possible consequences. He is able to relate his account of what happened. He knows the nature and object of the proceedings against him and he is able to work with his attorney, to help in his defense and is therefore, in my opinion, competent to proceed legally.

In addition, Rhoads testified that Dr. Cooke had also furnished him with an oral report, which was his practice in cases in which his findings were not beneficial. According to Rhoads, Dr. Cooke informed him that the defense of diminished capacity was unavailable, that defendant could understand *Miranda* warnings and could make a knowing and intelligent waiver of rights, and that Tucker had no remorse about lying and would be able to lie convincingly. Dr. Cooke added that if called as a witness, he would refer in his testimony to defendant's ability to lie persuasively. Rhoads testified that he had questioned Dr. Cooke about

the difference between his current report and his report in 1980 concerning defendant's ability to understand *Miranda* warnings. Dr. Cooke explained that defendant had matured, and in his opinion defendant clearly could understand the terminology. Rhoads testified that he had conferred with the head of the Public Defender's Regional Office and that they had agreed not to call Dr. Cooke as a witness or to attempt to hire another expert.

In that context, we understand defendant's argument to be that by barring the testimony of the proffered expert, the trial court prevented defendant from producing evidence to prove his retardation, which in turn would have suggested that defense counsel had performed ineffectively in failing to investigate further and adduce supportive expert testimony at trial. The trial court, however, rejected the premise for defendant's offer of proof, concluding on the basis of the testimony at the hearing that Rhoads had acted in a "reasonable and professional" manner in declining to seek further psychological evaluations. Accordingly, the trial court considered additional evidence concerning defendant's retardation irrelevant to the issue of counsel's ineffectiveness, and also expressed doubt about whether a recent psychological evaluation of defendant would be probative concerning his mental state at the time of the homicide. Finally, the trial court expressed concern that the admission of the expert testimony would inevitably lead to the prosecution offering an expert in rebuttal.

We have carefully reviewed the transcript of the remand hearing and concur in the Appellate Division's conclusion that the record adequately supports the trial court's finding that defendant was not denied effective assistance of counsel in respect of counsel's investigation of defendant's mental condition. See *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674, *reh'g denied*, 467 *U.S.* 1267, 104 *S.Ct.* 3562, 82 *L.Ed.*2d 864 (1984); *State v. Savage*, 120 *N.J.* 594, 617–18, 577 *A.*2d 455 (1990); *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). Nor do we find adequate basis under the circumstances to disturb the trial court's

discretionary ruling rejecting defendant's proffer of expert testimony on the question of defendant's mental retardation.

## VII

We affirm the judgment of conviction as well as the sentence imposed.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

W . 36 i= 3

# The State of New Jersey
## vs.

| COURT | | Defendant | Stanley Lee TUCKER |
| Trenton | | Address | 607 Edgewood Avenue |

COUNTY OF Mercer  N J

C —(87-20111=12)  11111

City State  Trenton, New Jersey

Case Number P-7-328-3091

SS#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/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

Defendant one of ___1___ defendants

Date of birth  5-14-59  Date of arrest  11-21-87

## COMPLAINT

Complainant  Detective Sergeant John Stankard  of Trenton Police Division - CIB

Residing at _____

Upon oath says that to the best of that that's knowledge information and belief the named defendant on or about the

24th day of November 1987 in the City of Trenton  County of Mercer  N J did,

within the jurisdiction of this court, at 45 Wilson Street, unlawfully enter the premises of Patricia Ann Warner with the intent to commit a crime therein.

Count 2:

within the jurisdiction of this court, at 45 Wilson Street, commit an act of robbery upon Patricia Ann Warner by forcibly removing from her possession a nineteen (19) inch color television, portable, valued at three hundred fifty (350) dollars and a 1979 Datsun, 200SX, valued at one thousand five hundred (1500) dollars in the course of committing a theft.

PROBABLE CAUSE: Statement and photographic identification by witness

| Charge Number 1 | Charge Number 2 | Charge Number 3 |
| N J S  20:18-2 | N J S  2C:15-1 | N J S |

Subscribed and sworn to before me this  28th  day of  November  19 87

Signed  _____

Signed  _____

To any peace officer or other authorized person Pursuant to this warrant you are hereby commanded to arrest the named defendant and bring (him) (her) forthwith before this court to answer the foregoing complaint

Bail has been fixed by _____ in the amount of $ _____

## COURT ACTION (Cases wherein judgment or Conditional Discharge is entered in this court)

## OTHER ACTION BY THIS COURT  Violent Crimes Penalty. Amt.

Other (Specify)

## BAIL INFORMATION

## PROSECUTING ATTORNEY AND DEFENSE COUNSEL INFORMATION

## MISCELLANEOUS INFORMATION

List Companion CDR numbers (Including Co-defendants)

NJ CDR 2 (REV 1 82)

ORIGINAL

(SSa1)